# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BOEHRINGER, Minors.

UNPUBLISHED
December 29, 2015

Nos. 326892; 326893
Wayne Circuit Court
Family Division
LC No. 13-513954-NA

Before: RONAYNE KRAUSE, P.J., and MARKEY and M. J. KELLY, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-mother (docket no. 326892) and respondent-father (docket no. 326893) each appeal by right the trial court's order terminating their parental rights to the four minor children, JMB, BLB, HRB, and BNB. On appeal, we conclude that the trial court did not clearly err when it found that the Department of Health and Human Services established grounds for terminating respondent-father's parental rights by clear and convincing evidence and did not clearly err when it found that termination of both respondents' parental rights was in the children's best interests. Consequently, we affirm.

## I. BASIC FACTS

In August 2013, the Department petitioned for the removal of the three older children from their parents' care. The Department alleged that the children witnessed an incident of domestic violence between their parents, which resulted in their father's arrest. The Department also alleged that respondent-mother was unable to care for the children as a result of her drug abuse and that the home was unsuitable. The Department related that it had offered services to the parents in 2011 and 2012 in an attempt to rectify problems related to improper supervision, drug abuse, and domestic violence, and maintained that the current problems were indicative that the parents had not benefited from those services. The Department also noted that HRB tested positive for THC and opiates at her birth in 2012.

---

[1] See *In re Boehringer Minors*, unpublished order of the Court of Appeals, entered April 22, 2015(Docket Nos. 326892 and 326893).

-1-

Respondent-mother testified at a hearing later that same month and admitted that the children had witnessed an incident of domestic violence, which resulted in her husband's arrest, that the home was "disorganized," that HRB had tested positive for THC and opiates at her birth, and that she had tested positive for marijuana, hydrocodone, and hydromorphone in July 2013. Respondent-father pleaded no-contest to the allegation that the children had witnessed domestic violence at the same hearing. On the basis of the admissions and plea, the trial court found that there were statutory grounds to take jurisdiction over the children and entered an order to that effect on August 29, 2013. The order further provided for supervised parenting time for both parents and required the Department to establish a parent-agency agreement and service plan for both parents.

The Department established a plan for respondent-father that centered on helping him obtain skills for emotional stability, positive communication, and proper parenting. It also required him to find suitable housing and to understand the importance of not allowing others— including his wife—to abuse drugs in front of the children. The Department required respondent-mother to obtain similar skills and suitable housing, but also required her to demonstrate clean and sober living and find employment. At a hearing held in September 2013, the Department's case worker, Jessica Rush, testified that the children had been placed with their maternal grandmother and described the plans and the services that the Department would provide.

Rush testified about the parents compliance with the plans at a hearing held in November 2013. She stated that respondent-mother had not submitted any drug screens, had twice missed her psychological intake, had not regularly visited with the children, and had missed her initial therapy session. As for respondent-father, Rush said he too missed his psychological intake, but had attended individual therapy. He also had only sporadic visits with the children and appeared to be living at a friend's home. The trial court found that both parents were not complying with their plans.

At a hearing held in February 2014, Rush testified that respondent-mother was still not in compliance with the requirements of her plan; Rush agreed that respondent-mother had been early terminated from every service provided by the Department. She left the rehab facility before she completed the program and tested positive for THC on one screen. Rush also described an incident where respondent-mother obtained Vicodin from her mother on Christmas day. Rush stated that respondent-father was in compliance with his parenting classes, but did not have regular visits with the children.

In May 2014, the trial court held another hearing. Rush testified that respondent-mother was pregnant by respondent-father and continued to be completely non-compliant with her plan. Rush stated that both respondents had stated that they were not planning together, but that she believed they were planning together on the basis of the evidence.[2] Rush stated that respondent-

_____

[2] Rush used the phrase "planning together" in the lower court proceedings to refer to the parties' intent either to separate and plan for the children's future separately, or to remain together and jointly plan for the children's future.

father was mostly compliant with his plan; he completed his psychological and psychiatric evaluations and parenting classes. He was also participating in his individual therapy. However, he continued to have issues with codependency and anger and was still living at a friend's home. At the conclusion of the hearing, the trial court found that respondent-mother was not in compliance with her plan and found that respondent-father was in compliance.

At an August 2014 hearing, Rush testified that she wanted to change the goal of the plan to adoption rather than reunification. She stated that respondents continued to have extensive contact—including two incidents where respondent-father drove his wife to the hospital because she stated she wanted to commit suicide—and both have issues with compliance. Respondent-father was partially compliant. He had moved from his friend's home, but was now living with his mother, which is also where his ex-wife lives with their two children. Although he had been visiting the children more, Rush stated that the children's bond with him was not strong. She was also concerned about his employment and felt that his codependency and anger issues made it unsafe for him to have unsupervised visits with the children. Finally, she stated that respondent-mother was not at all compliant with her plan. The trial court agreed that the plan should now be concurrent plans for adoption and reunification.

Respondent-mother gave birth to BNB in September 2014. The Department petitioned for the removal of BNB from both respondents' care in October 2014. It alleged that respondent-mother tested positive for opiates, THC, and Tricyclics at the child's birth. It also alleged that respondent-father reported that he knew respondent-mother was taking Vicodin during her pregnancy.

The trial court held a hearing later in October 2014. Respondent-father testified that he did not have suitable housing for the child—he was moving from place to place—and that he had three other children under the Department's care. Respondent-mother similarly conceded that she did not have proper housing and was not complying with the plan put in place by the Department with regard to her other children. On the basis of this testimony, the trial court found that there were grounds for exercising jurisdiction over BNB and placed the child with the Department. It also ordered the Department to establish a plan, which it stated "should probably just mirror" the existing service plans.

After the trial court took jurisdiction, it heard testimony by the parents' new case worker, Amy Miller. Miller testified that respondent-mother was still not in compliance with her plan. She testified that respondent-father was in partial compliance; he was attending some of his individual therapy sessions, but still did not have suitable housing. She further stated that neither parent was visiting regularly with the children.

In December 2014, Rush signed a supplemental petition on behalf of the Department asking the trial court to terminate both respondents' parental rights to the children under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). In the petition, the Department alleged, in relevant part, that respondent-mother had missed 77 of 77 random drug screens, had never provided the Department with proof of employment, did not have suitable housing, and had never had a permanent address. It alleged that respondent-father had not adequately established his income and did not have adequate housing.

-3-

At a hearing held in January 2015, Rush testified that respondents were living together in a hotel, but she had had no contact with them. Miller also testified and stated that respondent-mother had been arrested in December; she was arrested for possession of heroin and driving on a suspended license. She was in respondent-father's car at the time of her arrest. The trial court authorized the supplemental petition at that time and ordered that the respondents be given notice of a dispositional hearing by publication.

In February 2015, the trial court held a dispositional hearing on the supplemental petition. The respondents did not appear for the hearing, but their lawyers were present. Rush testified that she handled respondents' case from August 2013 to August 2014. During that time, respondent-mother never complied with her service plan; she never had housing—she "house-hopped or went to hotels", never had employment, did not consistently visit with the children, did not complete her psychological evaluation, and did not submit any random drug screens. Respondent-mother did take a drug screen at the court and tested positive for marijuana. Rush stated that respondent-mother never "addressed her substance abuse issues" and would blame her behavior on "her past history of when she was a child." She also "[p]retty much" relied on respondent-father for her income.

Rush stated that respondent-father did complete some of the services provided to him, but he was early terminated from therapy because his work schedule interfered with his ability to participate. Respondent-father said he worked as an independent contractor doing sound engineering or lighting engineering, but Rush never received adequate proof of his employment. Rush testified that respondent-father did not have adequate housing; he was living with his mother, which arrangement Rush felt was not appropriate, but was now living in a hotel. He also was not consistent with his visitation.

Rush testified that she felt that the court should terminate respondent-father's parental rights even though he made some progress. One serious concern with respondent-father was that, because of his work, he would leave the children in his wife's care while she was abusing substances. He also had a significant problem with codependency involving his wife: he is "obsessed with his wife. He follows her around. He needs to know her every move where she goes. Just everything pertains to his wife. His whole life [revolves] around his wife." She felt that the children would be at-risk if returned to his care because he had not benefited from the services provided to him and, specifically, because he continued to put his desire to be with his wife before his children's needs.

Miller similarly testified that respondent-mother had not complied with the service plan since Miller took over the case in August 2014. Miller stated that respondent-mother told her that she was not going to do the drug screens because she knew she would test positive. Miller also stated that respondent-father had not complied with the plan and that the children had no bonds to either parent. She also did not believe that it was in the children's best interests to continue services, even though the children were currently in family placement. She agreed that the children needed permanency and stability, which their parents could not provide. She noted that JMB had had some significant behavioral issues, but that his issues had stabilized while in his grandparents' care. The other children were also doing well in their placements.

-4-

In reviewing the evidence, the trial court first noted that the "parents gave up trying long before permanent custody was even discussed as an option." For that reason, the court rejected respondent-mother's lawyer's argument that the parents should be given more time. It also felt that the fact that the children had been placed with a relative did not weigh in favor of giving respondents more time. Had they admitted earlier that they were incapable of caring for the children and suggested a guardianship, the court might have entertained that idea: "But what they have done is receded further and further from the children's lives rather than try to get closer and make some sort of legitimate arrangements for the children to remain in care." The trial court then found, on the basis of the record evidence, that the Department had established by clear and convincing evidence grounds for terminating both respondents' parental rights to the minor children under MCL 712A.19b(3)(c)(*i*), (g), and (j), and that termination was in the children's best interests. The trial court entered an order to that effect in March 2015.

Respondents now appeal in this Court.

## II. STATUTORY GROUNDS

### A. STANDARD OF REVIEW

On appeal, respondent-father argues that the trial court clearly erred when it found that the Department established a ground for terminating his parental rights to the minor children. A trial court may terminate a parent's parental rights, if it finds that the petitioner established a statutory ground for termination by clear and convincing evidence. MCL 712A.19b(3). This Court reviews for clear error a trial court's finding that the petitioner established a ground for termination by clear and convincing evidence. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A trial court's finding is clearly erroneous when, after reviewing the entire record, this Court is left with the definite and firm conviction that the trial court has made a mistake. *Id.*

### B. ANALYSIS

The trial court, in relevant part, found that the Department had established grounds for terminating respondent-father's parental rights to the children under MCL 712A.19b(3)(g). A trial court may terminate a parent's parental rights under MCL 712A.19b(3)(g) when the parent, "without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age."

Although housing and income were issues for respondent-father, the most serious concerns with his parenting involved his relationship with his wife. There was evidence that respondent-father had a volatile relationship with his wife; indeed, the incident that (again) brought the children to the Department's attention involved domestic violence. In addition to that, Rush stated that the Department was concerned that respondent-father would leave the children in his wife's care, even though he knew she was abusing drugs. There was evidence that he also enabled her drug use. In order to rectify the problems stemming from his relationship with his wife, the Department provided respondent-father with services fashioned to help him develop skills to address his codependency, and to help him with emotional stability, good communication, and anger management. Nevertheless, after more than a year of services,

there was no indication that respondent-father had been able to overcome the issues arising from his relationship with his wife.

Respondent-father fought with his wife in front of the children and police officers became involved on at least two occasions. There was evidence too that he would travel as part of his work and leave the children in his wife's care with full knowledge that she had a serious drug problem that prevented her from safely caring for the children. Respondent-father understood that he needed to separate himself from his wife while she remained addicted to drugs, but was unable or unwilling to do so. He repeatedly represented to the Department that he was planning for the children's care on his own, but—despite his representations—continued to have contact with his wife; in fact, he impregnated his wife and, by the time of the dispositional hearing, was living in a hotel with her. He also apparently provided her with the car involved in her arrest for driving on a suspended license and possession of heroin. As Rush testified at the dispositional hearing, respondent-father was obsessed with his wife—and the evidence amply demonstrated that he continued to be obsessed with her. His codependency led to his problems with anger and domestic violence, and also contributed to his inability to provide proper care and custody. On the basis of this evidence, the trial court could find that, as a result of his dysfunctional relationship with his wife, respondent-father was unable to provide proper care and custody to his children and would continue to be unable to provide proper care and custody to them for the foreseeable future. The totality of this evidence, especially when considered along with the evidence that respondent-father had been unable to secure proper housing in over a year, sufficiently supported the trial court's finding that the Department had established grounds for terminating respondent-father's parental rights under MCL 712A.19b(3)(g) by clear and convincing evidence.

This same evidence also supported a finding that, based on respondent-father's "conduct or capacity" there was a "reasonable likelihood . . . that the child[ren] will be harmed if [they are] returned to the home of the parent." MCL 712A.19b(3)(j). The evidence demonstrated that respondent-father placed his need to be with his wife, even though she posed a danger to his children, before his children's need for a safe and stable home environment. Under different circumstances, respondent-mother might very well have been arrested after getting high and crashing respondent-father's car with the children inside, rather than merely for possession of heroin or driving on a suspended license. The trial court was not required to wait for such an incident before it could find that respondent-father's codependency placed the children in harm's way. Because the evidence showed that respondent-father had not demonstrated progress with regard to his codependency and that his wife had not made any progress with her addiction, the trial court could reasonably find that respondent-father would continue to be involved with his wife and that his continued involvement with her would likely result in harm to the children, if they were returned to his care. See MCL 712A.19b(3)(j).

On appeal, respondent-father makes much of the fact that he was partially compliant with his service plan; he maintains that his partial compliance was "indicative" of his intent to "eventually be reunified with the Children" and "shows that there was a reasonable [likelihood] that the conditions that brought the Children into care would be rectified." However, on this record, we cannot agree that there was evidence that he would rectify the behaviors that prevented him from properly caring for his children and protecting them from possible harm. It is not sufficient to be partially compliant with the case service plan; a parent must not only

-6-

participate in, but also benefit from, the services provided. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). We also do not accept respondent-father's argument that his noncompliance should be excused because he was merely the "victim of an unpredictable and onerous work schedule." The primary impediment to reunification was and remained respondent-father's inability to rectify the problems arising from his relationship with his wife. And it remained his obligation to demonstrate that he sufficiently benefited from the services provided to him, notwithstanding his work schedule. *Id.* Here, the evidence strongly suggested that respondent-father had not benefited from the services provided to him and would likely continue to engage in the same kind of behaviors that had historically prevented him from providing proper care and custody for his children, and that placed his children in danger of harm.

The trial court did not clearly err when it found that the Department had established by clear and convincing evidence grounds for terminating respondent-father's parental rights to the minor children under MCL 712A.19b(3)(g) and (j). *In re Mason*, 486 Mich at 152. Because the trial court only needed to find one statutory ground in order to terminate respondent-father's parental rights, we need not address the remaining ground for terminating his parental rights. *In re Frey*, 297 Mich App at 244.

### III. BEST INTERESTS

#### A. STANDARD OF REVIEW

On appeal, respondent-mother does not challenge the trial court's finding that the Department established a ground for terminating her parental rights by clear and convincing evidence; rather, she argues that the trial court erred when it found that the termination of her parental rights was in the children's best interests. This Court reviews for clear error the trial court's finding that termination was in the children's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

#### B. RESPONDENT-MOTHER

Even when a trial court finds that the petitioner established a statutory ground for terminating a parent's parental rights, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the child's best interests. *In re Gonzales/Martinez Minors*, 310 Mich App 426, 434; ___ NW2d ___ (2015). "The children's bond to the parent, the parent's parenting ability, and the children's need for permanency, stability, and finality are all factors for the court to consider in deciding whether termination is in the best interests of the children." *Id.* In addition, a child's placement with relatives is a factor that the trial court is required to consider and which generally weighs against termination. *Id.*

There was overwhelming evidence that respondent-mother had a serious drug addiction that prevented her from caring for her children and placed them at risk of harm while in her care. Respondent-mother made no effort to comply with her service plan and, in fact, made it abundantly clear that she had no intention of doing so. As the trial court aptly noted, respondent-mother had not done anything to foster her relationship to the children, but instead had "receded further and further from the children's lives." Her children simply did not take priority over her

addiction. The record evidence also demonstrated that respondent-mother's continued participation in her children's lives—however minimal—placed the children at risk. She could not even behave appropriately around her children on Christmas day. The children needed permanency and stability and respondent-mother's continued participation in their lives served only to disrupt and disorder the stability that they had found with their grandparents. Consequently, we cannot say that the trial court clearly erred when it found that it was in all of the children's best interests to terminate respondent-mother's parental rights. *In re White*, 303 Mich App at 713.

Respondent-mother also argues that the trial court erred when it failed to individually consider the best interests of the children. Specifically, she argues that the Department never gave her an opportunity to show that she could properly parent BNB, who was born in September 2014, and the infant's best interests clearly differed from those of the older children. The primary barrier to respondent-mother's reunification with her children was her drug abuse. And the evidence established that respondent-mother had done nothing to address that problem. The evidence that respondent-mother's drug abuse prevented her from properly caring for her older children and exposed them to harm was also probative of how she would treat BNB. See *In re Hudson*, 294 Mich App 261, 266; 817 NW2d 115 (2011). BNB also tested positive for drugs at birth and respondent-mother remained unwilling to do anything to address her addiction after the child's birth.

Moreover, while the trial court had an obligation "to view each child individually when determining whether termination of parental rights is in that child's best interests," *In re Olive/Metts Minors*, 297 Mich App 35, 42; 823 NW2d 144 (2012), it was not required to separately address the best interests of each child; rather, a trial court's findings are sufficient if it is evident that the trial court considered the children's individual situation. See *In re White*, 303 Mich App at 715-716 (rejecting the contention that the decision in *In re Olive/Metts Minors* requires "redundant factual findings concerning each child's best interests" and holding that the trial court need only make individual findings when the best interests of the children significantly differ). Here, the children's best interests were essentially the same. The trial court specifically noted that respondent-mother had no bond with any of the children and had effectively abandoned each of them. It also recognized that respondent-mother's continued participation in their lives was disruptive and contrary to their best interests.

The trial court did not clearly err when it found that termination of respondent-mother's parental rights to the children was in their best interests. *In re White*, 303 Mich App at 713.

## C. RESPONDENT-FATHER

On appeal, respondent-father also argues in a one-paragraph argument under a separate heading that the trial court erred when it determined that termination was "warranted." The heading refers to the trial court's exercise of discretion in terminating respondent-father's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). It is unclear what respondent-father means when he refers to the trial court's exercise of discretion; once the trial court found that a statutory ground had been established by clear and convincing evidence and found that termination was in the children's best interests, it had to enter an order terminating respondent-father's parental rights. See MCL 712A.19b(5). To the extent that respondent-father appears to

be challenging the trial court's best interests determination, we conclude that he has abandoned that claim of error by failing to properly address it on appeal. See *Berger v Berger*, 277 Mich App 700, 712; 747 NW2d 336 (2008). In any event, there was substantial evidence that respondent-father was unable to address his dysfunctional relationship with his wife and that his continued exercise of parental rights would, for that reason, likely continue to disrupt the stability and permanence the children needed. Therefore, we cannot state that the trial court clearly erred when it found that termination of respondent-father's parental rights was in the children's best interests. *In re White*, 303 Mich App at 713.

## IV. CONCLUSION

The trial court did not clearly err when it found that the Department had established at least two statutory grounds for terminating respondent-father's parental rights to the children. It also did not clearly err when it found that termination of both respondents' parental rights was in the children's best interests. Accordingly, we affirm in both dockets.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Jane E. Markey
/s/ Michael J. Kelly